May it please the court, counsel. Mr. Montenegro had a firearm enhancement, and the firearm enhancement added an additional two levels to his determination. Essentially, Mr. Montenegro has always maintained that the enhancement was inappropriate, that he was a sportsman who used weapons. The comment in the sentencing guidelines provides an example that we feel specifically fits Mr. Montenegro, and that is that the weapon enhancement should not be applied if the defendant was arrested at his residence and had an unloaded hunting rifle in the closet. In this particular case, Mr. Montenegro had two hunting rifles, a .308, a .300 Savage, a Browning 10-gauge, and also a .22-caliber pistol. The .22-caliber pistol doesn't appear to have any sporting use. That's what the district court said. Normally that would be the case. This individual is from a rural place in Idaho. Keton County is very mountainous, a lot of hunting going on, and in addition to those items being found, there is a .22-caliber pistol. Not per se. You say he's from a rural area, it's mountainous. Is there anything that might be unique to that area that a .22 pistol would be used for? Target shooting. Nothing from a hunting standpoint that typically .22 pistols are used for, but it's a pretty common weapon to have. It's not a .25-caliber semi-automatic or other kind of more typical pistol that's used in crimes of violence, 9mm, for example, things like that. As a result, he contends and still maintains that the pistol was just part of the usual weaponry he had when he went hunting. In addition, there were... One last question. That was the only pistol he had. Is there any evidence that he'd ever might have used this for target shooting? Any evidence that he had previously owned other pistols that would have had a hunting or target shooting function as opposed to a more nefarious purpose? No. The other point I was going to make is that in conjunction with the hunting pistols, there were two or three knives that were also found, a couple of skinning knives, one that's referred to as a grooming knife, binoculars, items that were essentially consistent with hunting and using those kinds of activities. Nevertheless, the court found that it was still clearly improbable that he used those weapons for those kinds of circumstances, and as a result granted the two-point enhancement. I can't tell you whether he was a hunter or a target shooter or a gun collector or anything like that. He did not. Counsel at sentencing made a proffer that the guns were unloaded, which was apparently true. I don't think there was ever any evidence or any indication in the pre-sentence report to the contrary that all of these weapons were found in a closet in the bedroom. They were all found together, and that the guns were unloaded. In effect, he made a proffer to that effect, but the judge specifically noted that there was no proffer that he was a sportsman or a hunter. That's what I was looking for. The guideline says, unless it is clearly improbable. I'm thinking, all these guns, I could see somebody having them and it having nothing to do with the drugs. If he said, well, I use a .22 all the time for shooting tin cans, and the .308 has a nice flat trajectory. I like it for hunting, and I hunt, but it looks like he didn't say any of those things. The implication was there just from the comments of counsel, and I think in his objection to the pre-sentence report and to that particular enhancement, counsel talks about that in a limited fashion, but really did nothing to raise that issue or even make that proffer in sentencing. It's not the evidence to get past the clearly improbable. Correct. Another use of guns is just have them standing there by the door or have them around so that somebody you're doing business with can see them. That's always a possibility, and certainly that's why the enhancement's there. In addition, we contend that as a result of the clearly improbable requirement by the court, that that also violates the amyline, that the burden of proof is to remain upon the government  unless it is clearly improbable language imposes a duty on the defendant to put forward some proof. There are a couple of cases. Those were cited. U.S. v. Lopez-Sandoval has the clearly improbable language. Heldberg, I think U.S. v. Pitt uses similar language. Are you suggesting that Lopez-Sandoval, which clearly runs against you, is no longer good law? No. I think that particular case factually is a bit of a problem for us. I think in that case, there was a four-month spread between the time the offense conduct took place and when the weapons were found. In this case, there was a one-month difference. One of the points that I would make is that there was a different time. There was no actual time with the offense, but I certainly acknowledge that there are cases out there that go as far as four months. Thank you, counsel. I wish there was some time for rebuttal. May it please the Court, I'm Allen Burrow, Assistant U.S. Attorney from Boise, Idaho. The government has fully briefed this issue. In a nutshell, we believe that the defendant's in the Lopez-Sandoval, Pitts, Heldberg, that line of cases. Is there anything in those cases, counsel, that has been affected by Booker and Blakely and Ameline? I would submit not, Your Honor. I don't think the issue has been addressed precisely since Booker has come out, but I believe the Lopez-Sandoval court anticipated that, in essence, by dealing with the Supreme Court's Bailey case. As the Court well knows, the Bailey case was the one where the Supreme Court held that mere possession was not enough under 924C. There had to be some kind of an act of use. The Supreme Court in Bailey distinguished the guidelines to the 1.1 enhancement from Bailey and said that the government, even under the mandatory guidelines, could get the enhancement by showing the simple possession and basically affirming that interpretation of the law with regard to this guideline enhancement. Do the guidelines make the enhancement mandatory unless the defense – so is the unless – does that become, then, an affirmative defense? Your Honor, my best way of understanding it is that when you look at the policy statement behind – the policy statement talks about the increased danger when firearms are possessed, when they're around, when they're there, and it's not tied to use or a connection with the offense. It seems to me that the – that it's more like a safety valve that allows the defense to come forward and say, yes, but in these circumstances here, the clearly the case that the gun was completely unrelated to offense. It's more like a safety valve. It's really not a burden shifting. And I would argue to the Court that Booker actually removes any impediment to this use by making the guidelines advisory. There's nothing in making the guidelines advisory that would undermine this Court's line of precedence in Lopez Sandoval and the other cases like that. Counsel, I can't quite remember. Pitts and Sandoval clearly say the gun doesn't have to be used in connection with. It just has to be possessed during. Did they also say that it is the defendant's burden to show that it's clearly improbable? Yes, Your Honor. Lopez Sandoval discusses how 2D1.1 is being applied in detail, and it discusses that, and that once the government has shown that the firearm was possessed. Possessed during. Right. Then the defense can overcome the enhancement by showing that under the circumstances, it's clear that the gun had no connection with the offense. What I'm wondering about, I don't know what you use a 10-gauge for, but all the others, they're certainly useful for sports or in the .22 caliber pistol case for flicking at tin cans, just keeping your skills up and having fun. And I take it there'd have to be some evidence from the defendant to show that it was clearly improbable that it was to intimidate other drug dealers? Yes, Your Honor, and that's what Judge Windmill, that's how he analyzed this case. He talked about the other guns that would have a more evident hunting and sporting use, but he said it was significant to him that the pistol would not have that kind of. They had the easiest time with the pistol rather than the hardest. The nice thing about a .22 is it only costs about a penny a shot, so you can damage a lot of tin cans without wasting a lot of money. If you did. That's true, Your Honor, but I think Judge Windmill here pointed out the fact that recreational shooting, I'll hardly ever use something that's 40 or 50 cents a shot. A penny a shot is a lot of money. Yeah, it's true, but it's also true that the number one hit weapon is a .22 pistol. Really? That's true. You kill people with .22s? That's not in the record, but it is true. But the thing is, and I'm not suggesting that the defendant was a hit man here, but Judge Windmill pointed out that there was no evidence of recreational use, of target shooting and that kind of thing. Based on the record before him, the enhancement applied, and then the coming forth to show that it was clear that the .22 pistol had no connection, that there was simply nothing there. And no guy got shot in the head 11 times with a .22 and then beat the shooter up and brought him into the police station. Anyway, we don't see anything in Booker that would change the law, and we think the judge handled this very conscientiously. He followed the precedent of this court. There's just no evidence about these guns except there they are, and that's what they are, and they're possessed during. I would point out to the court, too, I think it's significant. Judge Windmill referred to the defendant pled to one particular sale here, but it was stipulated in the plea agreement that his guidelines would be calculated as though he had been convicted of count one, which was the conspiracy. There were eight different sales, controlled sales, that took place here and there, as talked about in the precedent's report. Every one of those sales either took place at the defendant's residence or began at the defendant's residence, and then there were a couple that began there, and then they went off-site to actually finish the deal. But there's a clear pattern of him dealing drugs out of his house, and that's where the firearms were, and I think that's significant as well. Thank you, Your Honor. Counsel? Any rebuttal? A couple of points on the location. It was my understanding that there were three sales, and I could be wrong, but three separate sales, all of those either took place in the driveway or near the home, but there was some dialogue in the sentencing about where exactly those took place. As best I understand, they met downtown on at least a couple of those occasions and then went back, and in all but one, the deals took place in the driveway, and then I think in January 2002 in the last deal, the defendant actually went into the house. So, anyway, I just add that. Armitgear? Yes, Your Honor. I see you're from Blackfoot, Idaho. I am. My recollection is that Blaine Anderson, the judge of this court, was from Blackfoot, Idaho. Did you know of Blaine? I didn't. I got there shortly before or shortly after he left, so I didn't. Anyway, I just thought I'd mention it. Thank you. Thank you, counsel. United States v. Montenegro was...
judges: Thompson, Kleinfeld, Bybee